## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RONG L. LILLIEROOS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-12-1359-D |
| | ) | |
| STARR INDEMNITY & LIABILITY | ) | |
| COMPANY, a foreign insurance | ) | |
| company, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STARR INDEMNITY & LIABILITY | ) | |
| COMPANY, a foreign insurance company, | ) | |
| | ) | |
| Defendant/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CO-ORDINATED BENEFIT PLANS, INC. | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

### O R D E R

Before the Court is the Motion to Compel [Doc. No. 134] of Third-Party Defendant

Co-Ordinated Benefit Plans, Inc. (CBP). A response [Doc. No. 158] has been filed by Third-

Party Plaintiff Starr Indemnity & Liability Company (Starr) and CBP has filed a reply [Doc.

No. 163]. In addition, the Court conducted a hearing on this matter on August 10, 2015. The

matter, therefore, is ready for decision.

I.    **Background**

Starr insured Plaintiff, Rong L. Lillieroos (Plaintiff), pursuant to the terms of a short-term medical insurance policy.  Plaintiff submitted a claim under the policy arising from a medical procedure she underwent.  CBP denied the claim on grounds that Plaintiff's condition was pre-existing and, therefore, not covered by the policy.  Plaintiff then filed suit against Starr and brought claims under Oklahoma law for breach of contract and breach of the duty of good faith and fair dealing. During the course of litigation, Starr conceded liability as to Plaintiff's claims.

Starr filed a third-party complaint against CBP and alleged CBP breached the terms of the parties' Third-Party Administrator Agreement (Agreement).   Pursuant to the Agreement, CBP acted as third-party administrator of Starr's claims. Under the terms of the Agreement, CBP must indemnify Starr for damages proximately caused by CBP's gross negligence.  CBP has no obligation to indemnify Starr for inherent business risks. Starr alleges that CBP acted with gross negligence by, *inter alia*, making the decision to deny Plaintiff's claim based on an alleged pre-existing condition and ignoring her administrative appeal of that denial.

Several months later, Plaintiff settled her claims with Starr.  CBP is not a party to the settlement.  Although the terms of the settlement are confidential, it is undisputed that at Starr's request, the settlement was allocated between Plaintiff's bad faith claim and an unasserted claim that Plaintiff was considering adding through amendment of the complaint.

Plaintiff learned of the basis for the unasserted claim during discovery. According to the parties' contentions, the medical policy at issue required Starr to pay the medical bills of its policyholders at a "usual and customary rate." Instead, however, Starr paid medical claims based on a rate referred to as an "RBRVS" rate – a rate similar to, or less than, the standard Medicare rate. It is alleged that over CBP's objections, Starr directed CBP to pay claims – including Plaintiff's claim –  at the RBRVS rate. It is further alleged that Starr saved multiple millions of dollars utilizing the RBRVS rate in the course of its business dealings. According to CBP, under Oklahoma law, the savings to Starr is a relevant factor in determining Starr's exposure to Plaintiff for punitive damages.

The settlement resulted from a mediation between Plaintiff and Starr. CBP was present during the mediation but, as stated, did not participate in the settlement. Starr's representative at the mediation was John Cabrita, Jr., Associate Vice President of Program Business Claims (Cabrita). Cabrita has been deposed by CBP.[1] During his deposition, Cabrita testified that he had full settlement authority on behalf of Starr and that he made the decision to settle the action as to Plaintiff's claims against Starr based on his review of correspondence and other memoranda from Starr's counsel representing it in this action, Murray Abowitz, and the Hogan Lovells law firm, a firm routinely retained by Starr with

---

[1]CBP is unable to depose another employee of Starr involved in the settlement, Dick Thomas, as Mr. Thomas is now deceased. Moreover, Starr contends that Cabrita had the "sole responsibility for choosing whether to settle [Plaintiff's] allegations and under what terms to settle them." *See* Starr's Response at pp. 6-7.

respect to bad faith litigation brought against it. Cabrita testified he also relied upon his years of experience in the insurance industry and information received from Plaintiff's counsel.

CBP seeks production of the documents Cabrita and other Starr employees reviewed and relied upon in reaching Starr's settlement with Plaintiff. CBP contends the information is vital to the defense of its indemnification claim.

The parties agree that CBP has no obligation to indemnify Starr as to the portion of the settlement allocated to the unasserted claim related to Starr's use of the RBRVS rate. CBP contends that the allocation of 20% of the settlement to that unasserted claim is unreasonably low and is the result of collusive action by Starr. According to Cabrita, he determined an even smaller percentage allocation was appropriate – 10% – but ultimately agreed to the mediator's recommendation for a 20% allocation. Plaintiff has made clear she has no interest in the allocation of the settlement amounts and has made no recommendations with respect thereto.

Starr objects to the production of documents requested by CBP, asserting protections of the attorney-client privilege and work-product doctrine. Starr further objects to the scope of discovery requested and contends that to the extent CBP seeks documents that post-date the settlement, those documents are not relevant. Alternatively, CBP requests the Court conduct an *in camera* review of the documents requested prior to determining whether production is required.

## II.    Analysis

The parties agree that whether Starr must produce the subject documents depends upon whether Starr has waived the attorney-client privilege by placing the advice of counsel at issue. Pursuant to Rule 501 of the Federal Rules of Evidence, in this diversity action, Oklahoma law governs the scope of that privilege. *Seneca Ins. Co. v. Western Claims, Inc.*, 774 F.3d 1272, 1275 (10th Cir. 2014).

The parties further agree that "at issue" waiver is governed by the *Hearn* test. *See Seneca,* 774 F.3d at 1276 (applying *Hearn* test in determining application of attorney-client privilege under Oklahoma law).  Under the *Hearn* test, waiver occurs when the following requirements are met: (1) the party asserting the privilege did so as a result of some affirmative act, such as filing a lawsuit; (2) the affirmative act placed the protected information at issue by making it relevant to the case; and (3) the party opposing assertion of the privilege would be denied access to information vital to its defense if the privilege were applied. *Seneca*, 774 F.3d at 1276 (*citing Frontier Refining, Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 699 (10th Cir, 1998); *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975)).

The Tenth Circuit has made clear that the first two prongs of the *Hearn* test should not be construed in a manner that would create a "meaningless threshold that would allow admission of any potentially relevant advice from an attorney." *Seneca*, 774 F.3d at 1277 (quotations omitted).  Instead, the affirmative act is a "crucial" requirement. *Id*.

In *Seneca*, the affirmative act was not merely bringing an action to recover the amount of the settlement in the underlying litigation, but also relying on advice of counsel "as a reason – if not the primary reason – for settling [the underlying litigation]." *Id*. Two communications from counsel – prepared during the underlying litigation and relied upon to settle that litigation – were at issue in *Seneca*. First, an attorney named James N. Isbell provided correspondence to Seneca contemporaneously with the issuance of a loss report prepared by Seneca's Claims Examiner, John Mrakovcic. The loss report suggested a settlement range of $200,000 to $500,000. The attorney's correspondence: (1) detailed Seneca's handling of the claim; (2) summarized Oklahoma law regarding bad faith; (3) made suggestions regarding Seneca's appraisal or replacement options; and (4) suggested that Seneca's failure to pay the claim could make it vulnerable to a bad faith claim and, therefore, punitive damages. Second, about four months after the first correspondence, a lawyer from a different firm, Murray Abowitz, provided correspondence to Seneca which similarly addressed potential deficiencies and flaws with respect to the claims handling and further addressed the potential for bad faith exposure.[2] As the Tenth Circuit found, "[c]onsistent with Abowitz's advice" Seneca settled the underlying litigation for $1 million. *Id*. at 1274.

Specifically, in *Seneca*, at trial Mrakovcic testified that he relied on both the Isbell and Abowitz correspondence in handling the claim and that Gregory Crapanzano, Seneca's Vice President of Property Claims, told him that Seneca settled the underlying litigation based on

---

[2]Mr. Abowitz represents Starr in this litigation.

Abowitz's advice. Crapanzano also testified at trial. Crapanzano concluded the settlement was reasonable based on "conversations with counsel" and "conversations with the home office." Two other witnesses testifying on behalf of Seneca also testified that they relied on Abowitz's advice in particular in determining the settlement amount in the underlying litigation.

Under these circumstances, the Tenth Circuit found the first two factors of the *Hearn* test satisfied. The Court distinguished its prior holding in *Frontier Ref. Inc. v. Gorman-Rupp Co.*, 136 F.3d 695 (10th Cir. 1998), a case in which the court concluded the attorney-client privilege had not been waived as a result of the plaintiff's affirmative act of bringing an indemnity claim. In *Frontier*, "the court framed the issue as whether 'Frontier had waived its attorney-client privilege in *bringing* th[e] indemnity action against [the defendant]." *Seneca*, 774 F.3d at 1277 (*citing Frontier*, 136 F.3d at 700 (emphasis added)). But in *Frontier*, the company did not rely on protected information to justify its right to recovery in the indemnity action or the settlements, or to determine the reasonableness of the underlying settlements. *Id*. Conversely, in *Seneca*, the affirmative act included not only Seneca's decision to sue, but also Seneca's express reliance on advice of counsel as the reason for settling the underlying lawsuit. *Id*.

Although these first two factors were crucial factors, the third *Hearn* factor was dispositive in the *Seneca* case. The court determined the privileged information was vital to the defense because the information contained in the Isbell and Abowitz correspondence was

not available from any other source. The court again found *Frontier* distinguishable on this point:

> This case, however, differs significantly from *Frontier* in that the 'other sources' – namely Seneca's officers – generally did not rely on their own reasons for settling with Route 66 for $1 million. Instead, they chose to rely on 'advice of counsel' to justify the reasonableness of the settlement.

*Id*. at 1277. Under this scenario, the court found that allowing Seneca to rely on advice of counsel to establish the reasonableness of the settlement while excluding the contents of that advice from the defendant would contravene the principle that the privilege cannot be used as both a sword and a shield. *Id*. at 1277-78.

In the instant action, the affirmative act at issue is Starr's conduct in bringing the third-party indemnity claim against CBP. To prevail on the indemnification claim, Starr must establish that CBP's gross negligence proximately caused the damages claimed by Plaintiff. CBP contends the denial of Plaintiff's claim was made in good faith and, therefore, its conduct did not cause the damages claimed by Plaintiff.

CBP further attempts to place the reasonableness of the settlement at issue relying on the 80/20 allocation of the settlement between the bad faith claim and the unasserted claim. Because the parties agree that CBP is not liable for that portion of the settlement attributable to the unasserted claim, CBP wants to attribute a greater percentage allocation of the settlement to the unasserted claim.

Cabrita testified that Starr's decision to settle was not based on any of its own conduct, but instead, based on CBP's conduct. *See* Cabrita Deposition [Doc. No. 135] at pp. 88-89.[3] Although Cabrita's testimony provides an "other source" through which CBP can inquire as to the reasonableness of the settlement, Cabrita testified that he primarily, if not exclusively, relied upon information received from counsel to determine the reasonableness of any settlement.[4] Starr contends it will prove its indemnity claim without relying on any advice of counsel evidence. But CBP contends Cabrita's testimony shows he did rely on advice of counsel and without the ability to test the underlying basis for Cabrita's decision through examination of that evidence, Starr will impermissibly be using the protected information as a shield and a sword.

As to the unasserted claim, *i.e.,* the RBRVS issue, Cabrita testified that he did not think the RBRVS issue had merit. Cabrita Deposition at pp. 92-96. He further testified that settlement of the RBRVS issue was based on a cost-of-litigation analysis and that the percentage allocated to the claim was based on a cost factor and not due to Starr's culpable conduct. *See id* at pp. 93-94, 103-104. He testified the settlement amount did not include any amounts attributable to punitive damages in relation to the RBRVS issue. *Id.* at p. 104.

---

[3]CBP filed Cabrita's Deposition under seal to protect the confidential nature of the settlement between Plaintiff and Starr. The Court has addressed portions of the Cabrita Deposition in this Order but has not revealed any confidential terms of the settlement in doing so.

[4]Cabrita testified the only information he relied upon to evaluate the case was correspondence from Starr's counsel, the mediation correspondence from Plaintiff's counsel, and his experience in the industry. *See* Cabrita Deposition at pp. 52, 53, 62, 116-117.

He repeatedly testified that he thought the RBRVS issue lacked merit. He further testified

that no analysis regarding exposure due to the RBRVS issue was conducted independent of

the information contained in correspondence from Starr's counsel and Plaintiff's counsel. *Id*.

at pp. 104-105.

In contrast to Mr. Cabrita's testimony and his view that the RBRVS issue was factored

into the settlement as a cost of litigation, prior to reaching the settlement with Starr,

Plaintiff's counsel stated during its negotiations that Starr's largest exposure was based on

the RBRVS issue. *See* Correspondence [Doc. No. 134-8] at p. 4, ¶ 8. Plaintiff's counsel

further believed the savings to Starr would be a factor in determining a punitive damage

award under Oklahoma law.[5] Plaintiff's counsel later threatened a potential class action

lawsuit based on the RBRVS issue. *See* Correspondence [Doc. No. 134-10]. Plaintiff's final

demand letter, prior to settlement, again emphasized the scope of the RBRVS issue and the

potential for a class action, and that Starr faced exposure to significant punitive damages in

relation thereto. *See* Correspondence [Doc. No. 134-11].

Under the particular circumstances presented, prior to making a determination as to

the waiver issue, the Court believes an *in camera* review of the subject documents is

warranted. The Court must determine whether Starr's employee, Cabrita, generally relied

on his own reasons in reaching the settlement, or whether Cabrita in fact relied on advice of

---

[5]Plaintiff's counsel cited Oklahoma's uniform jury instruction No. 5.9 as support, which
provides that factors that may be considered in determining a punitive damage award include, *inter
alia*, "[t]he profitability of the misconduct to the Defendant." *See* Correspondence at p. 3, ¶ 7.

counsel. The Court is hard-pressed to make this determination in light of Cabrita's testimony that he alone made the settlement determination and his simultaneous acknowledgment that he relied on information from counsel to make that determination and did not conduct any independent examination of the claim. The virtual equipoise of Cabrita's testimony may, itself, deem the protected information vital to CBP's defense. Certainly, the parties have strategically framed the factual record with the competing holdings of *Frontier* and *Seneca* at the forefront.

Moreover, the rather dramatic variance between Cabrita's view of the significance of the RBRVS issue and the view expressed by Plaintiff's counsel leads the Court to believe an *in camera* review is a prudent and necessary step in resolving the parties' discovery dispute. In sum, whether the documents at issue are vital to CBP's defense cannot be accurately ascertained without such an *in camera* review.

## III.    Conclusion

The Court directs Starr to produce to the Court for *in camera* review documents actually reviewed by Mr. Cabrita (or any other Starr employee) to reach the settlement with Plaintiff. The documents shall be temporally limited to those generated on or before April 8, 2014, the date of the settlement.

IT IS THEREFORE ORDERED that the Motion to Compel [Doc. No. 134] of Third-Party Defendant Co-Ordinated Benefit Plans, Inc. is GRANTED in part, as set forth more fully herein.

IT IS FURTHER ORDERED that Defendant Starr Indemnity & Liability Company shall produce the documents for *in camera* review within fourteen (14) days of the date of this Order.

IT IS SO ORDERED this 26th day of August, 2015.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE